Matthew C. Maclear (Bar No. 209228)
Email: mcm@atalawgroup.com
Jason Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
J. Thomas Brett (Bar. No. 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (415) 568-5200

Lauren Chase (Bar No. 324162)
Email: lauren@coastkeeper.org
Barry Lee (Bar No. 349773)
Email: barry@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff*
ORANGE COUNTY COASTKEEPER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit association,<br><br>Plaintiff,<br>v.<br><br>ACD, LLC, a California corporation; CRYOGENIC INDUSTRIES, INC., a Delaware corporation; CRYOGENIC INDUSTRIES SERVICE COMPANIES, LLC, a California corporation; NIKKISO AMERICA, INC., a Delaware corporation; CREF3 PULLMAN 2 OWNER LLC, a Delaware corporation,<br><br>Defendants. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper (hereafter "Coastkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On October 18, 2023, Coastkeeper issued a 60-day notice letter ("Notice Letter"), to the registered agent for service of process (40 C.F.R. § 135.2(a)(2)) for ACD, LLC, Cryogenic Industries, Inc., Cryogenic Industries Service Companies, LLC, Nikkiso America, Inc., and CREF3 Pullman 2 Owner LLC (collectively "ACD" or "Defendants"), as the owners and operators of the Facility under its control. The Notice Letter informed Defendants of its violations of California's Storm Water Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No.* 2014-0057-DWQ) and amended by Order No. 2015-0122 – DWQ (July 1, 2015) and incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order 2018-0028-DWQ (effective July 1, 2020) (hereafter the "Storm Water Permit") and the Clean Water Act at the industrial facility located at 2321 S. Pullman Street Santa Ana, CA 92705  with Waste Discharger Identification Number ("WDID") 8 30I027856 (hereafter, the "Facility").

3.     The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

4.     In addition to Defendants agent for service of process, Plaintiff sent a copy

of Notice Letter to the Attorney General of the United States, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A**, and is fully incorporated herein by reference as though fully set forth.

5.     More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6.     Venue is proper in the Central District of California pursuant to Section 505©(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

7.     Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.     <u>INTRODUCTION</u>

8.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. The receiving waters at issue in this case – namely, the Peters Canyon Channel, San Diego Creek, Newport Bay, and/or the Pacific Ocean (hereafter, the "Receiving Waters) –  are ecologically sensitive areas. Although pollution and habitat destruction have drastically

diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water often contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, zinc, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

9.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in Standard Units ("SU") represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert

witness fees, for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at the Facility.[1]

11.     Plaintiff specifically alleges violations regarding Defendants' discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.     PARTIES

### A.     Orange County Coastkeeper

12.     Orange County Coastkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper maintains an office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

13.     Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.     Coastkeeper members work, own homes, and live in Orange County and use and enjoy the waters near the Facility, including the Receiving Waters. Coastkeeper's Members use these waters to participate in a variety of water sports and other activities, including, but not limited to, surfing, swimming, boating, kayaking, bird watching, wildlife viewing, hiking, biking, fishing, wading, standup paddle boarding, walking, and running. Additionally, Coastkeeper's members use the waters to engage in scientific studies including monitoring and restoration activities. The discharge of pollutants from the Facility impairs each of these uses.

---

[1] The Facility is fully described in Section V below.

Complaint for Declaratory and Injunctive     5
and Civil Penalties Relief

15.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendants' discharge of polluted storm water from the Facility. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by the Owner(s)' and/or Operator(s)' failure to comply with the Clean Water Act and the Storm Water Permit.

16.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

17.     The interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendants' activities.

**B.     The Owners and/or Operators of the Facility**

18.     Plaintiff is informed and believes, and thereon alleges, that Defendant ACD, LLC is an active California limited liability company with a principal place of business at 2321 S. Pullman St., Santa Ana, California 92705.

19.     Plaintiff is informed and believes, and thereon alleges, that Defendant Cryogenic Industries, Inc. is an active Delaware Corporation with a principal place of business at 27710 Jefferson Ave., Suite 301, Temecula, CA 92590.

20.     Plaintiff is informed and believes, and thereon alleges, that Defendant Cryogenic Industries Service Companies, LLC is an active California limited liability company with a principal place of business at 1851 Kaiser Ave, Irvine, California 92614.

21.     Plaintiff is informed and believes, and thereon alleges, that Defendant Nikkiso America, Inc. is an active Delaware Corporation with a principal place of business at 27710 Jefferson Ave., Suite 301, Temecula, CA 92590.

22.     Plaintiff is informed and believes, and thereon alleges, that Defendant CREF3 Pullman 2 Owner LLC is an active Delaware corporation with a principal place of business at 1345 Avenue of the Americas, New York, NY 10105.

23.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Defendants ACD, LLC, Cryogenic Industries Service Companies, LLC, and Cryogenic Industries, Inc. is Joseph D. Abkin, 200 E. Carrillo St., Suite 201, Santa Barbara, California 91203.

24.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Defendant CREF3 Pullman 2 Owner LLC is C T CORPORATION SYSTEM, Attn: Amanda Garcia, 330 N Brand Blvd., Suite 700 Glendale, CA 91203.

25.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Defendant Nikkiso America, Inc. is CSC – Lawyers Incorporating Service, Attn: Becky Degeorge, 2710 Gateway Oaks Dr., Suite 150N Sacramento, CA 95833.

26.     Plaintiff is informed and believes, and thereon alleges, that Defendants ACD, LLC, Cryogenic Industries, Inc., Cryogenic Industries Service Companies, LLC, Nikkiso America, Inc., and CREF3 Pullman 2 Owner LLC have each been an owner and/or operator of the Facility since at least 2018 and at all times relevant to this Complaint.

27.     Coastkeeper refers to Defendants' and their management herein as the "Owners/Operators" of the Facility.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

28.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

29.     Section 402(p) of the CWA establishes a framework for regulating

municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

30.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

31.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342.; *see* 40 C.F.R. § 122.26(c)(1).

32.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

33.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

34.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

35.     "Navigable waters" means "Waters of the United States." 33 U.S.C. §

1362(7); 33 CFR § 328.3.

36.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

37.     Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

38.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

39.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after December 20, 2015 commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects the Owners and Operators to a penalty of up to $64,618 per day per violation.

40.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

41.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

42.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer

its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

43.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

44.    The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997 (effective July 1, 1997), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.    On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ*. Storm Water Permit, Section I(A) (Finding 4).

46.    On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

47.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its

terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

48.     Except as authorized by Section IV of the Storm Water Permit, permittees are prohibited from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition III.B.

### C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

49.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

50.     Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, iron, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

51.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

52.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Section V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

53.     The EPA's most recent, 2021 Parameter Benchmark Values for the following parameters, among others, are as follows: **TSS**—100 mg/L; **aluminum**—1.1 mg/L; **copper**—0.00519 mg/L; **zinc**—0.12 mg/L; **pH**—6.0-9.0 SU. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

54.     The Storm Water Permit contains Numeric Action Levels ("NALs") generally mirror the 2008 EPA Benchmark Values. *See* Storm Water Permit, Section I(M)(Finding 62).  Annual NALs, not accounting for water hardness, for the following parameters are: **pH**—6.0 – 9.0 SU; **TSS**—100 mg/L; **copper**—0.0332 mg/L; **zinc**—0.26 mg/L; **iron**—1.0 mg/L; **N+N**—0.68 mg/L; **O&G**—15 mg/L; and **aluminum**—0.75 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: **pH**—6.0-9.0 SU; **TSS**—400mg/L; **O&G**—25mg/L. *Id*.

55.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Stormwater Permit Section XII.A.

56.     Receiving Water Limitation VI(B) of the Storm Water Permit prohibits

storm water discharges from adversely impacting human health or the environment.

57.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

58.     Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

59.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

60.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

61.     The State Water Quality Control Board, Santa Region, has issued the Water Quality Control Plan for the Santa Ana Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies.

62.      The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 4-1. The Basin Plan also provides that "Toxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *Id*. at 4-6.

63.     The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland portions of the Receiving Waters. *Id.* at 4-18.

64.     The Basin Plan identifies the "Beneficial Uses" of water bodies in the Regional Board's region. The Basin Plan identifies the Beneficial Uses for the Receiving Waters to include, collectively: water contact recreation (REC1); non-contact water recreation (REC2); commercial and sport fishing (COMM); wildlife habitat (WILD);

rare, threatened, or endangered species (RARE); navigation (NAV); warm freshwater habitat (WARM); groundwater recharge (GWR); spawning, reproduction, and development (SPWN); marine habitat (MAR); shellfish harvesting (SHEL); Preservation of Biological Habitats of Special Significance (BIOL); and estuarine habitat (EST). *See* Santa Ana Basin Plan at Table 3-1.

65.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

66.     The Receiving Waters are impaired for: Toxaphene, pH, Indicator Bacteria, Benthic Community Effects, Malathion, Selenium, Nutrients, Sedimentation/Siltation, Chlordane, PCBs (Polychlorinated biphenyls), DDT (Dichlorodiphenyltrichloroethane), and Copper.

67.     In addition, EPA has promulgated a WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which applies to the Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38, which is not the case here. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria for and zinc are 0.013 mg/L for copper and 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

68.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

69.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive     14
and Civil Penalties Relief

Water Limitations. *See* Storm Water Permit, Section VI(A).

**D.     The Storm Water Permit's Numeric Effluent Limitations**

70.     Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Receiving Waters (specifically San Diego Creek, Newport Bay) include toxic pollutants. Storm Water Permit, Attachment E, Table E-1. (40 C.F.R. § 401.15.)

71.     The following NELs apply to the San Diego Creek Watershed, into which the Facility discharges: 0.0097 mg/L for **cadmium**, 0.027 mg/L for **copper**, 0.194 mg/L for **lead**, and 0.21 mg/L for **zinc**. Storm Water Permit, Attachment E, Table F.45.

72.     An exceedance of an NEL constitutes a violation of the Storm Water Permit. Storm Water Permit, Attachment C at 5. An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. Storm Water Permit, Sections V(C)(1) and VII(E).

**E.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

73.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(J) (Finding 68) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

74.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

75.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

76.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

77.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

## F.     The Storm Water Permit's Monitoring Implementation Program Requirements

78.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)–(D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

79.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

80.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

81.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the

permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

82.     Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

83.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

84.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

85.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit, Section XI(B)(4).

86.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

87.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

88.     Dischargers in full compliance with Permit requirements may be eligible for Sampling Frequency Reduction (hereafter "SFR") Certification in accordance with Permit, Section XI.C.7. Members with a valid SFR Certification may reduce the

frequency with which they sample storm water to one (1) QSE  within the first half of each reporting year (July 1 to December 31), and one (1) QSEs within the second half of each reporting year (January 1 to June 30).

89.     The Storm Water Permit makes clear that the SFR Certification requires "full compliance with the requirements of this General Permit . . ." *Id.* at XI.C.7.a.ii. A discharger loses its SFR certification if an NAL exceedance occurs. Storm Water Permit Section XI.C.7.g.

90.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

91.     All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 3559, "Special Industry Machinery, Not Elsewhere Classified." While this SIC Codes does not require sampling of any additional parameters, all Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6).

92.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

# V.    STATEMENT OF FACTS

## A.    ACD's Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

93.    Defendants operate an industrial facility located at 2321 S. Pullman St. Santa Ana, CA 92705. The Facility's NOI states that the site is approximately 3.82 acres, with approximately 2.54 acres of industrial area exposed to storm water. Plaintiff is informed and believes that the Facility's primary industrial purpose of the Facility is the engineering and manufacturing of machinery designed to operate at cryogenic temperatures.

94.    The Facility's SWPPP, last updated September 2020 ("Facility SWPPP"), states that the Facility operates Monday through Friday, 8:00 am to 5:00 pm, and Saturday 6:00 AM to 12:00 PM.

95.    Plaintiff is informed and believes, and thereon alleges, that industrial activities, and supporting facilities, at the site, many of them conducted outdoors and exposed to storm water include, but are not limited to, indoor production areas, outdoor material storage and storage areas, shipping and receiving docks, covered outdoor work areas, and hazardous material storage and storage areas.

96.    Plaintiff is also informed and believes that truck and forklift traffic, commuter vehicle traffic, and parking also occur at the Facility.

97.    Metal shavings, chips, dust and particulates, and chemical sediment from the industrial activities at the Facility can accumulate around the Facility. Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water. While the Facility samples for O&G, pH, and TSS, Coastkeeper is informed and believes, based on sampling, that the following pollutants of concern are also present at the Facility:  **copper**, **iron**, **zinc**, and **aluminum**.

98.    The Facility SWPPP lists only O&G, pH, and TSS as part of its pollutant source assessment.

99.    The industrial areas and associated activities generate and release pollutants

at the Facility which are discharged in storm water to the Santa Ana municipal separate storm sewer system (MS4). The Facility's discharges then flow to an Unnamed Tributary of Peters Canyon Channel, then to Peters Canyon Channel, then to San Diego Creek, then to Newport Bay, and ultimately to the Pacific Ocean.

100.   The Facility is located less than 1,000 feet from the Unnamed Tributary to Peters Canyon Channel, and less than two miles from San Diego Creek.

101.   The Facility SWPPP identifies three discharge locations at the Facility: DP#1, located at the northwest driveway; DP#2, located at the northeast driveway; and DP#3, located at the southeastern gate entrance. According to the SWPPP, all three discharge locations discharge to municipal storm drains, which convey water to the Unnamed Tributary of Peters Canyon Channel, and ultimately to Peter Canyon Channel itself. From there, again, discharges flow to San Diego Creek and ultimately to Newport Bay and the Pacific Ocean.

102.   The Facility SWPPP claims that the "drainage area leading to DP#3 is not exposed to any industrial activities as the only potential industrial area, the Hazardous Material Storage areas, is completely covered and contained. With no exposure to industrial activities DP#3 will not require sampling" As explained further below, however, Plaintiff is informed and believes that industrial activities occur in DP#3, including but not limited to, hazardous materials storage, covered work, and/or material storage areas. Coastkeeper is further informed and believes that these industrial activities are exposed to storm water falling on and running off of the Facility.

103.   The Facility SWPPP indicates that hazard materials storage areas and covered storage and/or word areas are located within DP#3. Coastkeeper is also informed and believes that uncovered material storage takes place within DP#3. Materials (including hazardous materials) necessarily must be transported to and from these areas, through DP#3. Here, Plaintiff is informed and believes that industrial activities take place in DP#3 in the form of the "storage…transportation, or conveyance of…industrial raw material, intermediate product, final product, or waste product." *See* Storm Water Permit

Sections XVII.B.2-3.

104. Peters Canyon Channel and San Diego Creek are both relatively permanent tributaries to the Pacific Ocean, an interstate, navigable in fact water and one of the territorial seas. Peters Canyon Channel and San Diego Creek are "waters of the United States" subject to regulation under the CWA. *Sackett v. EPA*, No. 21-454, 2023 U.S. LEXIS 2202, at *29-30 (May 25, 2023) (quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006)). The Facility, furthermore, discharges pollutants directly to these Receiving Waters and/or its discharges are the functional equivalent of direct discharges to those waters in violation of the Clean Water Act. *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1476 (2020).

**B.     The Receiving Waters**

105. Coastkeeper's members utilize the Receiving Waters – namely, Peters Canyon Channel, San Diego Creek, Newport Bay, and the Pacific Ocean – for recreation, scientific study through pollution and habitat monitoring and restoration activities.

106. The Receiving Waters are impaired, ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters.

**C.     The Facility Storm Water Permit Coverage**

107. SMARTS lists the current Facility WDID number for the Facility as 8 30I027856 and coverage under the Storm Water Permit as "Active."

108. The NOI for the Facility lists the receiving water for the Facility as Peters Canyon Channel.

109. Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in April 2021.

**D.     The Facility is Operating with an Inadequately Developed and/or Implemented Stormwater Pollution Prevention Plan**

110.   Plaintiff is informed and believes, and thereon alleges, that ACD has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least October 19, 2018. ACD has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

111.   Plaintiff is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

112.   Plaintiff is informed and believes, and thereon alleges, that ACD has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Storm Water Permit, Sections X(H)(1)(a)–(g).

113.   Plaintiff is informed and believes, and thereon alleges, that ACD has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. Storm Water Permit, Section X(H)(2) According to the Facility SWPPP, the Facility's advanced BMPs are limited to exposure minimization BMPs, including storage areas at storm-resistant storage containers located in the east of the Facility, indoor production and shipping/receiving areas, and industrial wattles and other filter products deployed prior to storm events in DP#1 and DP#2.

114.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least October 19, 2018October 19, 2018.

115.   Plaintiff is informed and believes, and thereon alleges, that storm water

discharges containing excess levels of zinc, iron, copper, pH, and aluminum occur each time storm water discharges from Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

116.   Plaintiff has collected samples of storm water runoff discharging from the Facility during multiple precipitation events dating back to 2019. The table attached hereto as **Exhibit 1** to **Exhibit A** sets forth results exceeding NALs and NELs in samples collected by Plaintiff.[3]

117.   Based on its investigation of the Facility, including the results of storm water samples it has collected at the Facility since 2019 at **Exhibit 1** to **Exhibit A**, Plaintiff is informed and believes that there are industrial sources of zinc, copper, iron, and aluminum at the Facility. Yet, the Facility SWPPP fails to describe or assess these potential pollutant sources at the Facility, in violation of Section X(G) of the general permit.

118.   Plaintiff is informed and believes that the Site Maps included in the Facility SWPPP has not been updated since 2021 and is out of compliance with the Storm Water Permit.

119.   The Facility's southern boundaries is unclear from the Site Maps provided in the Facility SWPPP, and it appears that some southernmost areas of the Facility may be excluded from the Maps, in violation of the Permit. *See* Storm Water Permit, Section X.E.3.a.

120.   The Site Maps included in the Facility SWPPP fail to accurately depict areas of industrial activity as required by the Permit. *See* Storm Water Permit, Section X.E.3.f. Specifically, there are discrepancies between the industrial activities described in the Site Maps such that it is impossible to know what types of activities take place in certain areas. Most notably, the Site Map at Figure 3 of the SWPPP identifies areas at the southeast corner of the Facility as "Covered Storage" and demarcates those aeras with

---

[3] Plaintiff has become aware of one typo in **Exhibit 1** to **Exhibit A**. Specifically, **Exhibit 1** inadvertently identifies ACD as having collected the two zinc samples on December 11, 2022. Those samples were, in fact, collected by Plaintiff not Defendants.

orange-shaded boxes. The next Site Map at Figure 4, however, demarcates those same areas as "Indoor Production." This discrepancy makes it impossible to determine what type of industrial activities.

121.   Plaintiff is further informed and believes that there is uncovered material storage in the southeastern portion of the Facility, including at or around DP#3, and which is not labeled or demarcated on the Site Maps in violation of the Permit. *See* Storm Water Permit, Section X.E.3.f.

122.   The Site Maps contained in the Facility SWPPP also identify any structural control measures, including secondary containment areas in violation of the Stormwater Permit. *See* Storm Water Permit, Section X.E.3.c.

123.   Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs / NELs demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

124.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendants have failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

125.   Plaintiff is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

126.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that

this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

127.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

**E.   Storm Water Discharges from the Facility**

128.   As discussed above and as detailed in the Facility SWPPP, storm water runoff at the Facility flows from DP#1, DP#2, and DP#3, out of the Facility and into the Santa Ana municipal storm drains. From there it flows to an Unnamed Tributary of Peters Canyon Channel, and then to Peters Canyon Channel itself; from there, discharges flow to San Diego Creek, which ultimately flows to Newport Bay and the Pacific Ocean.

129.   Plaintiff is informed and believes, and thereon alleges, that ACD has discharged storm water and unauthorized non-storm water from the Facility containing TSS, O&G, pH, aluminum, copper, iron, and zinc in excess of applicable NALs and/or NELs over the past five (5) reporting years.

**F.   The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

130.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water to the Santa Ana municipal storm drains, then into the Unnamed Tributary to Peters Canyon Channel, then to Peters Canyon Channel, then to San Diego Creek, and finally to Newport Bay and the Pacific Ocean.

131.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows to the Receiving Waters, including the Peters Canyon Channel, San Diego Creek, Newport Bay, and the Pacific Ocean, all of which are Waters of  he United States.

132.   Information available to Coastkeeper indicates industrial materials and

equipment are stored outside without adequate cover or containment, resulting in discharges of polluted storm water and prohibited non-storm water. These activities are all significant pollutant sources at the Facility.

133.    Storm water discharges containing pollutants including, but not limited to, pH and heavy metals such as zinc, iron, copper, aluminum, discharged from the Facility, adversely affect the aquatic environment.

134.    Samples of storm water discharges collected at the Facility by Plaintiff contain pollutants including iron, zinc, aluminum, copper, and pH in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

135.    Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] – or any other storm water or non-storm water discharge – that has occurred at the Facility since October 19, 2018October 19, 2018, through the present, Defendants have discharged and continue to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

### G.    Defendants' Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements

136.    Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

---

[4] Dates of significant rain events are measured at the Santa Ana Fire Station, CA US USC00040192 station located near the intersection of Cypress Ave & E Walnut St, based on data recorded by NOAA. A significant rain event is defined by EPA as a rainfall event generating 0.1 inches or more of rainfall, which generally results in discharges at a typical industrial facility. Here, Coastkeeper is informed and believes that the Facility discharged pollutant-laden storm water on at least 111 significant rain events from October 18, 2018 to October 10, 2023, including discharges in excess of applicable NELs for the San Diego Creek watershed, as measured by this rain gauge. The NOAA rain data from this rain gauge is attached hereto as **Exhibit 2** to **Exhibit A**.

137.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

138.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

139.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

140.   Based on storm water samples collected by Coastkeeper at the Facility (see **Exhibit 1** to **Exhibit A**), and when compared with analytic sample results submitted by the Defendants to SMARTS, Coastkeeper is informed and believes that Defendants have failed and continue to fail to sample for aluminum, copper, zinc, and iron in violation of the Permit where those constituents are present at the Facility and should properly be included in the Facility SWPPP's pollutant source assessment. *See* Storm Water Permit Section XI.B.6.c.

141.   Defendants are further required to sample for copper and zinc due to the applicable NELs listed in Attachment E to the Storm Water Permit for the San Diego Creek Watershed, into which the Facility discharges its storm water. Yet, Defendants have failed and continue to fail to sample for these parameters.

142.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect or analyze storm water samples from all discharge points at the Facility in violation of Section XI of the General Permit. Specifically, and as described above, Defendants have never collected or analyzed samples at DP#3 despite the fact that industrial operations occur there and storm water discharges from that point.

143.   The Facility Owner(s) and/or Operator(s) have failed and continue to fail to collect storm water discharge samples as required by the Permit. Specifically, the Facility

Owner(s) and/or Operator(s) collected and/or reported samples as follows:

- 2018-2019: three of four required sampling events reported
- 2019-2020: two of four required sampling events reported
- 2020-2021: one of four required sampling events reported
- 2021-2022: three of four required sampling events reported
- 2023-2024: zero sampling events reported as of date of Complaint

144.   The Annual Report submitted to SMARTS by the Defendants for the 2019-2020 Reporting Year indicates that the ACD "sampled the required number of Qualifying Storm Events (2) during the first half of the reporting year. However, the facility did not collect any samples from the second half of the reporting year as rain events generated insufficient discharge and occurred outside of operating hours…." Coastkeeper is informed and believes, however, that there was sufficient rainfall to collect samples in during the second half of the 2019-2020 Reporting Year.

145.   The Annual Report submitted by Defendants for the 2020-2021 Reporting Year indicates that the Facility "sample[d] the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B." Yet only one sample result for that Reporting Year was submitted to SMARTS.

146.   At the time that the Notice Letter at **Exhibit A** was served, the Annual Report submitted by Defendants for the 2021-2022 Reporting Year indicated that the Facility collected one sample in the first half of the Reporting Year, but was unable to collect a sample during the second half of the Reporting Year as required due to insufficient rainfall. Yet, Defendants had submitted no sample results for the 2021-2022 Reporting Year. Coastkeeper is informed and believes that there was sufficient rainfall to collect samples in during the second half of the 2021-2022 Reporting Year. Indeed, Coastkeeper staff were able to collect storm water samples from the Facility on March 28, 2022. **Exhibit 1** to **Exhibit A**. On this date, Coastkeeper staff observed employees present at the Facility and the business appeared to be operating. Coastkeeper is also informed and believes that there were rainfall events sufficient to produce discharges at the Facility during both halves of both Reporting Years such that the Facility Owner(s)

and/or Operator(s) could have collected samples as required by the Permit. *See* **Exhibit 1** to **Exhibit A**.

147.   Since the Notice Letter was served, Defendants uploaded new sample results for the 2021-2022 Reporting Year. These results were uploaded to SMARTs on November 30, 2023 and purport to show analytic testing results for storm water samples taken on October 25 and December 14, 2021 and March 28, 2022. None of these newly uploaded sample results indicate that samples were collected at DP#3. Nor do the sample reports analyze concentrations of aluminum, iron, zinc, or copper in the Facility's storm water discharges. Finally, these newly submitted results for the 2020-2021 Reporting Year are late; Permit Section XI.B.11.a. requires the Facility to submit all sampling results within 30 days of obtaining the same. Each day beyond this 30-day reporting window that the Facility fails to upload sampling results constitutes a violation of the Permit and the Clean Water Act.

148.   The Annual Report submitted by the Facility Owner(s) and/or Operator(s) for the 2022-2023 Reporting Year indicates that the Facility "sample[d] the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B." Yet, at the time of the Notice Letter, only three sample results for that Reporting Year had been submitted to SMARTS.

149.   Since the Notice Letter was served, Defendants uploaded new sample results, for the 2022-2023 Reporting Year. These results were uploaded to SMARTS on November 30, 2023 and purport to show analytic testing results for storm water samples taken on January 10, 2023 (over eleven months ago). None of these newly uploaded sample results indicate that samples were collected at DP#3. Nor do the sample reports analyze concentrations of aluminum, iron, zinc, or copper in the Facility's storm water discharges. Finally, these newly submitted results for the 2022-2023 Reporting Year are late; Permit Section XI.B.11.a. requires the Facility to submit all sampling results within 30 days of obtaining the same. Each day beyond this 30-day reporting window that the Facility fails to upload sampling results constitutes a violation of the Permit and the

Clean Water Act.

150. Thus far in the 2023-2024 Reporting Year, the Facility has not uploaded sampling results. Yet Coastkeeper is informed and believes that there has been sufficient rainfall to permit sampling where Plaintiff collected a sample from a rain event in August 2023. *See* **Exhibit 1** to **Exhibit A.**

151. Plaintiff, moreover, is informed and believes that despite submitting documentation to SMARTS in an attempt to qualify for the Sampling Frequency Reduction Certification, Defendants have never met the requirements for said Certification. Permit, Section XI.C.7. As discussed throughout this Complaint, the Facility is not in full Permit compliance and is thus ineligible for Sampling Frequency Reduction Certification. *See* Storm Water Permit Section XI.C.7.a.ii.

152. Based upon the failure to collect the storm water discharge samples as required, Plaintiff is further informed and believes that the Facility has failed to conduct monthly dry weather visual observations and/or keep and maintain records of such observations in violation of Section XI(A) of the Storm Water Permit. Similarly, Coastkeeper is informed and believes that the Facility has failed to conduct and/or document discharge visual observations from each discharge location as required by Section XI(A) of the Storm Water Permit.

153. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

154. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

155. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is

1  submitted.

2    156.   Plaintiff is informed and believes, and thereon alleges, that the

3  Owners/Operators did not report their non-compliance as required by the Storm Water

4  Permit.

5    157.   Plaintiff is informed and believes, and thereon alleges, that the

6  Owners/Operators of the Facility fail to collect sufficient storm water samples during

7  QSEs.

8    158.   Information available to Plaintiff is informed and believes, and thereon

9  alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient

10  and ineffective in reducing pollutants to levels compliant with the Storm Water Permit

11  and/or the CWA.

12    159.   Plaintiff is informed and believes, and thereon alleges, that Defendants have

13  failed to submit accurate Annual Reports to the Regional Board for the past five reporting

14  years in violation of Section XVI of the Storm Water Permit.

15    160.

16  **VI.   CLAIMS FOR RELIEF**

17  

**FIRST CAUSE OF ACTION**

18  **Violations of  the Storm Water Permit's Effluent Limitations and the Clean Water
Act.**

19  **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

20    161.   Plaintiff incorporates the allegations contained in the above paragraphs as

21  though fully set forth herein.

22    162.   Plaintiff is informed and believes, and thereon alleges, that Defendants

23  failed and continue to fail to reduce or prevent pollutants associated with industrial

24  activities at the Facility from discharging from the Facility through implementation of

25  BMPs that achieve BAT/BCT.

26    163.   Plaintiff is informed and believes, and thereon alleges, that discharges of

27  storm water containing levels of pollutants that do not reflect compliance with BAT/BCT

28  standards from the Facility occur every time storm water discharges from the Facility.

Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Sections I(D) (Finding 32) V(A); 33 U.S.C. § 1311(b).

164.   The Owners/Operators will continue to discharge excessive concentrations of pollutants each and every time storm water is discharged from the Facility without implementation of BAT/BCT at the Facility.

165.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to implement BMPs that comply with the BAT/BCT requirements of the Storm Water Permit. The failure to do so constitutes a violation of the Effluent Limitations of Section V.A. of Storm Water Permit. Every day during which Defendants have failed to implement BMPs that comply with the BAT/BCT requirements of the Storm Water Permit constitutes a violation. *See* Storm Water Permit, Sections I(D) & V.A.

166.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

167.   Each day since at least October 19, 2018 that the Owners/Operators fail to implement BAT/BCT at the Facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

168.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 19, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

169.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

170.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

171.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

172.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

173.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable Basin Plan, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

174.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

175.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

176.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

177.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA

occurring from October 19, 2018October 19, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

178.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

179.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

180.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

181.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

182.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

183.   Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

184.   The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from October 19, 2018October 19, 2018, to the present.

185.   The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

186.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

187.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

188.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 19, 2018October 19, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

189.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

190.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

191.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

192.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the

Facility, in violation of the Storm Water Permit.

193.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

194.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

195.   The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from October 19, 2018October 19, 2018 to the present.

196.   The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

197.   The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

198.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

199.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 19, 2018October 19, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

200.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

201.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.   **RELIEF REQUESTED**

202.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.   A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.   A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $64,618 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.   Any other relief as this Court may deem appropriate.

Dated: December 19, 2023                    Respectfully submitted,

_/s/_ Matthew C. Maclear
Matthew C. Maclear

Jason R. Flanders
James T. Brett
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiff
ORANGE COUNTY COASTKEEPER